## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 2:23-cr-97-JAW |
| CHARLES ALLEN BARNES | |

### GOVERNMENT'S SENTENCING MEMORANDUM

During the early morning hours of August 30, 2022, the defendant Charles Barnes left a shocking, hate-filled message for one of his African American neighbors in which he repeatedly called her a "nigger" and a "black bitch," and threatened to "gut" her, "cut her tongue out," and kill her, her children or her boyfriend. Later that same morning, after the victim frantically called 911, a Lewiston police officer encountered the defendant sitting in a lawn chair in front of his apartment with a large fixed-blade hunting knife strapped to his waist. For the reasons discussed herein, the government contends that the threats in this case were not only outrageous but racially motivated, and that Barnes subsequently engaged in conduct evidencing an intent to carry out the threat. Accordingly, the Government intends to recommend at sentencing that the Court impose a sentence of 33 months of imprisonment, which represents a sentence the high end of the United States Sentencing Guideline ("U.S.S.G.") range that the government believes properly applies to this case.[1]

### I.    Introduction

On August 20, 2022, defendant Barnes confronted his neighbor, VICTIM 1, in the parking lot of their apartment complex after hearing that VICTIM 1's son had been in a

---

[1] Even if this Court were to find that one or both of these guideline enhancements did not apply, the Government would still advocate for a sentence of 33 months, given the profoundly disturbing nature of the defendant's threats and their impact on the victims in this case.

physical altercation with Barnes's son. After haranguing VICTIM 1 and her boyfriend, the defendant stormed off and called the police. An officer responded but made no arrests in relation to the confrontation between the juveniles. VICTIM 1 reprimanded her son for getting physical with a younger boy, and thought the matter was settled.

But the next morning, VICTIM 1 awoke to a terrifying warning from a friend. The defendant had left the friend, whom he knew as a neighbor at a former residence, a voice message in the middle of the night in which he claimed to be lying in wait outside VICTIM 1's apartment. In the message, Barnes announced his intention to murder the next person who stepped out the front door. The message was laden with racial slurs and bigoted vitriol:

> *"I actually, since you know this one, some big, fat, black bitch named Naysha or Leisha or somethin', and her son [name of VICTIM 1's son], okay [VICTIM 1's son] beat up [Barnes' son][2], claiming that [Barnes' son] was laughin' about, they— dead cousin or some bullshit – named [T]. [Barnes' son] doesn't know them, I don't know them, but this bitch, she's like 'how would you know? [mocking nonverbal sounds]' Okay, well, next time, next time I'm just gonna gut me a big-ass fucking nigger. Okay? And since— you know this girl, and you know I will. Okay? So, as a friend to friend, like, next time I see her little dog off the leash, it's getting put down. And then next time I see that big fat fucking nasty-ass black bitch running her mouth at my son, I'm gonna cut her tongue out of her fucking head, okay? Now, I'm playing nice this time, cuz she's a friend, and the cops are involved, and there was all kinds of kids around, but now that I know which apartment is hers? I've been parked outside her apartment since early this fucking morning, sis. Waiting for someone to step outside. And the first one who does is gonna die. Just like that. I don't care if it's her kid, or her, or her boyfriend. I don't care, I don't care. I'm killing me a nigger. So let's just put it that way. So you need to handle—handle this, cuz she's a friend of yours."*

Too frightened to leave her apartment, VICTIM 1 skipped work and called the police. The same officer who had answered the defendant's earlier call regarding the

---

[2] In the message, Barnes used the actual name of Victim 1's son, as well as his own son's name. The names have been redacted, however, to protect the privacy interests of both juveniles.

juvenile altercation responded. After listening to the message, the officer became extremely concerned and went looking for the defendant, whom he found sitting in a folding chair in the apartment complex parking lot, armed with a large knife in a sheath on his belt. The officer arrested the defendant on the spot for the state offense of Terrorizing.

## II.     Procedural History

On September 7, 2023, a grand jury returned an Indictment charging the defendant with a single count of making a threat in interstate commerce, in violation of 18 U.S.C. § 875(c). The indictment contained a Special Finding alleging that the defendant had intentionally selected the victim of the charged offense because of the race of any person. The Special Finding was included because the Sentencing Guidelines require that the sentencing enhancement described at U.S.S.G. § 3A1.1(a)—which provides for a three-level upward adjustment if a defendant selects the victim of an offense because of race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person—be found by the trier of fact.

The parties thereafter entered into a Plea Agreement (ECF No. 26) which provided that the defendant would plead guilty to the charged offense, but that the parties would preserve all rights to litigate the applicability of U.S.S.G. § 3A1.1(a) at the sentencing hearing. At the change-of-plea hearing held on March 18, 2023, the Court and the parties discussed how the indictment should be modified in order for the record of the defendant's plea to the Indictment to reflect this agreement. After discussion, the government consented to a defense motion to strike the Special Finding as surplusage, reserving all rights to pursue the § 3A1.1 enhancement at sentencing, with the Court—which serves as trier of fact with respect to a guilty plea—making the necessary factual findings.

### III.    Sentencing Considerations

In imposing an appropriate sentence in this case, the Court is called upon to consider both the advisory sentencing guidelines and the statutory sentencing factors enumerated in 18 U.S.C. § 3553.

### A.    The Guideline Sentence

### 1.    Total Offense Level

The government agrees with the Probation Office's calculation of the applicable Offense Level in all respects except for its recommendation not to apply the three-point upward adjustment for "Hate Crime Motive" (i.e., selection of victim because of race) under U.S.S.G. § 3A1.1(a).

The Probation Office correctly identified U.S.S.G. § 2A6.1 as supplying a base offense level of 12 for a conviction under 18 U.S.C. § 875(c). Probation further correctly applied a six-level upward adjustment for the defendant having engaged in conduct evincing an intent to carry out his threat. The facts relayed in the PSR, of which the government intends to present evidence at the sentencing hearing, provide a more-than-sufficient basis for this Court to find, by a preponderance of the evidence, that the defendant did in fact intend to carry out his threat to harm or kill VICTIM 1 or a member of her household. The defendant was found a short distance away from VICTIM 1's apartment (the location of which he mentioned having learned in his voice message to VICTIM 1's friend), armed with the precise type of weapon that would be used to carry out the violent acts ("gut[ting]," and "cutting,") that he had referred to in the threat. He was sitting outdoors, in a folding chair, a short distance away from VICTIM 1's apartment, in the same parking lot where VICTIM 1's car (which has a conspicuous custom license plate) was parked. The government's investigation has revealed no innocent explanation for his

waiting in the victim's parking lot while armed. To the contrary, from all appearances, a gruesome crime of violence was narrowly avoided by VICTIM 1's friend's warning and the intervention of police.  And any self-serving claims to the contrary by the defendant now are belied by the evidence.

As the Probation Office correctly notes, even if a finding of exogenous conduct is required to apply the six-level enhancement provided by U.S.S.G. § 2A6.1(b)(1), the facts here are sufficient to meet that requirement. Having made his threat, the defendant armed himself with a large fixed-blade hunting knife and positioned himself in a place where he was likely to encounter his victim. That separate course of conduct extends well beyond mere transmission of the threat.[3]

### a.   Hate Crime Motive

The government's sole point of disagreement with the Probation Office concerns the application (or, in this case, Probation's *non*-application) of the three-point upward adjustment provided by U.S.S.G. § 3A1.1(a).

§ 3A1.1(a) is an unusual provision of the Sentencing Guidelines in that, where a case is resolved by plea, it requires that the sentencing court find the facts that trigger its applicability beyond a reasonable doubt, as opposed to by a preponderance of the evidence. As relevant here, it provides that the offense level applicable to a count of conviction be increased by three levels if the sentencing court finds, beyond a reasonable doubt, that "the defendant intentionally selected <u>any victim</u> or any property as the object of the offense of conviction <u>because of</u> the actual or perceived race [or] color . . . of <u>any person</u>." (emphases added).

---

[3] Indeed, the fact that the police officer who responded to the scene chose to immediately put Barnes in handcuffs and transport him to jail is further evidence that the police viewed Barnes as a real and immediate threat to VICTIM 1, *at that moment*.

The provision's causality language ("because of" a person's protected characteristic) requires the government to establish that the characteristic was a "but-for cause" of the offense. *Burrage v. United States*, 571 U.S. 204 (2014) (generally interpreting causal language, including "because of" and "results from" in federal criminal statutes to impose require proof of but-for causation unless "text or context" require otherwise).

Accordingly, the question presented to the Court in deciding whether § 3A1.1 applies to the facts of this case is whether the race of any person involved in the events that precipitated the defendant's crime was a but-for cause of his actions. Put another way, the Court must determine whether Barnes would have threatened VICTIM 1 and her family at the time and in the manner that he did had VICTIM 1, and her son, and her boyfriend, all been white rather than black.

Like other factual questions involving motive and subjective intent, the answer to that inquiry will necessarily have to be inferred from circumstantial evidence.[4] At the sentencing hearing in this case, the government will present powerful circumstantial evidence from which the Court may easily find, beyond a reasonable doubt, that Barnes

---

[4] In the PSR, the Probation Office does not apply the enhancement because of the "possibility" that Barnes "took it to extremes and made the threats because that is his *historical response* to stimuli and those extremes/threats *happened to include* racist language and hate speech." PSR, ¶ 24 (emphasis added). With all due respect to the Probation Office, that analysis appears to misapprehend the government's burden of proof and give insufficient weight to the powerful circumstantial evidence in this case. *See, e.g., United States v. Rodriguez,*  162 F.3d 135, 145 (1st Cir. 1998) ("Proof beyond a reasonable doubt does not mean proof beyond all possible doubt or proof to a mathematical certainty."); *United States v. Ortiz-Colon,* 2023 WL 2042179, at *2 (D.P.R. 2023) ("It is well established that 'circumstantial evidence and the inferences drawn from it may be sufficient to sustain a conviction.'") (quoting *United States v. Maymi-Mavsonet,* 812 F.3d 233, 236 (1st Cir. 2016)). *See also* Final Jury Instructions given in *United States v. Napoleon Gonzalez, a/k/a "Guillermo Gonzalez,"* Criminal No. 21-cr-117-JAW, at 3, 5 ("A reasonable doubt does not mean a *mere possibility* that [the defendant] may be not guilty[,]" and the "law permits you to give equal weight to both" direct and indirect evidence.) (emphasis added). In addition, to be fair, the Probation Office did not have the benefit of all the evidence that will be presented in support of this enhancement (including the audio recording of Barnes' message, which is powerful), all of which is more fully described above.

6

would not have threatened to kill and maim VICTIM 1 and her family if they had been white (i.e., had it not been for their race).

The evidence the government intends to present falls into three broad categories: (1) the language, content, context, and tone of the threatening communication itself; (2), evidence that Barnes harbored deep-seated animus toward black people and adhered to white supremacist ideology; and (3) evidence that Barnes, on another occasion when he was making statements to the parent of a child whose behavior he objected to, had implied that he would not subject her children to violence because her children were white.

The most powerful evidence that the defendant was motivated to threaten VICTIM 1's family because of race is the language he elected to use in the course of threatening them. In his voice message, the defendant injected the issue of race into a dispute that had not theretofore involved it. As Barnes himself explains in the voice message, the dispute between his son and VICTIM 1's son had been over a perceived slight to a deceased family member, and there is no evidence that race played any role in the confrontation between the two boys. Nevertheless, the defendant called VICTIM 1 a "nigger" (twice) and a "nasty-ass black bitch." Barnes' deliberate language choices, under circumstances in which questions of race had not previously arisen, establish that the defendant's anger was not merely at his son having been involved in a physical confrontation with another child, or at VICTIM 1's reaction to his earlier in-person accusations, but that his anger was sharply intensified by his perception that he or his son had been wronged by *black* people.

Regarding the defendant's pre-existing racism, the government will present testimony from VICTIM 1's friend, the mutual acquaintance of the defendant's and VICTIM 1's to whom the threatening message was sent. VICTIM 1's friend will testify that, from her prior acquaintance with Barnes, she knew him to harbor strong racial animus

7

toward black people. She will testify to having seen YouTube videos that Barnes made in which he, while wearing a mask, discussed his intense dislike of Somalian immigrants and refugees in the Lewiston area, whom he regularly referred to as "sand niggers" in his videos. She will additionally testify to having a conversation with Barnes in which he described himself as a "skinner" (which she took to mean that he identified with the "racist skinhead" neo-nazi ideology) and showed her a notebook in which he had drawn tattoo-like sketches containing Nazi swastikas). Finally, she will testify that, when she began a romantic relationship with a black man, Barnes repeatedly made unwelcome remarks to her about the negative characteristics of black men and told her she should end the relationship and date white men instead. When she did not do so, Barnes stopped talking to her.

Courts have repeatedly held that, where a finder of fact is called upon to decide whether a defendant acted "because of race," the defendant's pre-existing racial prejudice is relevant circumstantial evidence. In *United States v. Diggins*, No. 2:18-CR-122, 2020 WL 1066979, at *1 (D. Me. Mar. 5, 2020), another judge of this Court found that evidence of a hate crime defendant's racist tattoos was relevant to the jury's consideration of whether the defendant had assaulted the victim because of race). That ruling was cited approvingly in *United States v. McMichael, et al.*, No. 2:21-CR-22 (S.D. Ga. Jan, 1, 2022) in which the Court permitted the government to offer evidence of the defendants' animus toward black people in order to show that they had chased and shot a black jogger because of his race (noting that "courts have regularly concluded evidence of racial animus is relevant when a hate crime is being prosecuted and racially motivated hatred is an element of the offense. *See United States v. Magleby*, 241 F.3d 1306, 1318–19 (10th Cir. 2001) (holding evidence the defendant listened to CD with racist lyrics was relevant to

establishing the defendant targeted the victims because of their race); *United States v. Skillman*, 922 F.2d 1370, 1374 (9th Cir. 1990) (holding the district court properly admitted evidence of defendant's association with skinheads where defendant was charged with a hate crime because it "tended to establish" racial animus and that he may act on his beliefs); *United States v. Franklin*, 704 F.2d 1183, 1187–88 (10th Cir. 1983) (admitting testimony regarding the defendant's self-identification as a racist and strong dislike of African Americans and Jews and the mixing of black and white races is relevant given the statute requires the government to prove the defendants have acted because of the victim's race); *United States v. Crawford*, 66 F. Supp. 3d 1311, 1320 (D. Or. 2014) ("defendant's comments about the mosque, Muslims, jihad, and being a Christian warrior have some tendency to make the fact of religious animus more or less probable than it would without such evidence."); *Diggins*, 2020 WL 1066979, at *1 (finding evidence of the defendant's "racially charged tattoos" tends to show the defendant holds racist beliefs, which is relevant to an element of the hate crime for which he was charged)").

Here, the government intends to show the defendant's preexisting racial animus by witness testimony and hearsay to the effect that he regularly used racial slurs, made negative comments about black people both in-person and online, described himself as a racist skinhead, reacted negatively to a witness's inter-racial dating relationship, and showed the witness sketches he had drawn incorporating nazi iconography.

Finally, the government will present evidence of a conversation between the defendant and another resident of the same apartment complex in which the defendant complained about that resident's children's behavior. In that conversation, the defendant stated that the witness was "lucky [her] children are white," which the witness took to mean that, had her children not been white, Barnes would have harmed them due to his

dissatisfaction with their behavior. The defendant's statement that he would have retaliated against a white neighbor's children for alleged misbehavior had they not been white is strong evidence that VICTIM 1 and her son's racial identity was a but-for cause of the defendant's violent reaction to the altercation between his son and her son.

Taken together, the Government respectfully submits that this evidence is more than sufficient for the Court to find, beyond a reasonable doubt, that race was a but-for cause of the defendant's crime.

### B.      Acceptance of Responsibility

Probation correctly applied a two-level reduction of the offense level under U.S.S.G. § 3E1.1(a) because the defendant has demonstrated acceptance of responsibility by pleading guilty. Because the defendant assisted the government by giving notice of his intent to plead guilty in time for the government to avoid preparing for trial, the government hereby moves for an additional one-level reduction of the Offense Level pursuant to U.S.S.G. § 3E1.1(b).

#### 1.      Criminal History Category

The defendant has no prior convictions. Therefore, his Criminal History Category is I, based on a total of zero criminal history points.

The 2023 Amendments to the Sentencing Guidelines entitle many defendants with zero criminal history points to a two-level downward adjustment to the Combined Offense Level determined under chapters two and three of the Guidelines. *See* U.S.S.G. § 4C1.1. However, to qualify for the adjustment, a defendant must meet all of ten enumerated criteria. Here, the defendant fails to satisfy at least two of the criteria. § 4C1.1(a)(2) disqualifies defendants who "use[d] violence or threats of violence in connection with the

offense" (emphasis added); § (a)(7) disqualifies defendants who "possess[ed] . . . a firearm or other dangerous weapon . . . in connection with the offense." (emphasis added)

If the Court applies the § 3A1.1(a) enhancement discussed above, that would provide a third independent basis for denying the zero-point adjustment under § 4C1.1(a)(9), which disqualifies defendants who receive an adjustment under § 3A1.1.

### 2.      Final Guideline Sentence

Accounting for the adjustments discussed herein, the government believes that the correct Adjusted Offense Level is 18. With a Criminal History Category of I, the guideline range is 27 to 33 months of imprisonment.

### a.    18 U.S.C. § 3553

The federal sentencing statute, 18 U.S.C. § 3553, provides that, in addition to the Guidelines, a sentencing court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, and; (2) the need for the sentence imposed– (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. With these factors in mind, the court should fashion a sentence that is sufficient, but not greater than necessary, to carry them out. Id.

In the government's view, the nature and circumstances of this crime place it at the most serious end of the spectrum of mine-run threats cases, making a sentence at the high end of the guidelines appropriate. The defendant was apprehended while armed with a dangerous weapon, apparently lying in wait to commit the very assault he had threatened.

Had that assault been accomplished, it would have borne all of the characteristics of a classic lynching: a perceived insult to a white family by a black one punished swiftly by a public act of violence. The type of physical mutilation that the defendant threatened to perpetrate only strengthens that impression.

The seriousness of the crime is also reflected in the impact it had on the victim and her young family.  As VICTIM 1 explains in her victim impact statement, the defendant's actions had a profound impact on her and her children. As VICTIM 1 noted, her "14 year old son will never forget the day that a 46 year old racist man planned to stab him to death when he walked out of his home," and her "9 year old daughter will never forget the day a man was planning on killing her mother, her brother, and the only man figure she has in her life .... *The day when her value as a young African American girl was reduced to one hateful word*."[5]

Because the Guidelines provide an upward adjustment for conduct evincing intent, this aspect of the crime does not place it outside the heartland of cases to which the Guidelines apply. But the defendant's apprehension under circumstances so proximate to those under which the threat could have been carried out are aggravating, and weigh in favor of a 33-month sentence.

There are both aggravating and mitigating facts bearing on the defendant's history and characteristics. His history of misdemeanor convictions shows a pattern of domestic violence and of violation of court orders. Relatedly, he appears to have significant mental health problems that manifest as outbursts of violent (although not random) rage. There is no indication in the PSR, however, that his mental health diagnoses have caused or would

---

[5] VICTIM 1 plans to attend the sentencing and has asked that her Victim Impact Statement be read aloud during the proceeding.

cause feelings of racial animus of the kind that the defendant has expressed in less-controlled settings than his interview with the Probation Office. His claim to Probation that he is not a racist is belied by his actions in this case and by the evidence of people who knew him before he came under court supervision, who have described him as a proud, outspoken, and committed racial bigot. In the government's view, the defendant's history and characteristics provide no basis to depart or vary downward from the guideline range.

The statutorily-enumerated purposes of sentencing also counsel in favor of 33-month sentence. There is a strong need generally to deter the sending of online and telephonic threats, which are endemic and continue to impose a major strain on law enforcement resources at all levels. A significant sentence of incarceration will also send the message that racially motivated acts of hate are antithetical to the values espoused by most Mainers and will not be tolerated. Finally, while the defendant has a First Amendment right to hold and voice bigoted views, there is a strong need to specifically deter him from again expressing those views through threats of violence again in the future.

For reasons already discussed, the defendant's behavior raises grave concerns about possible danger to the public. The longer period of incapacitation provided by a 33-month sentence would help ensure public safety.

Lastly, the PSR indicates that the defendant has a substantial need for treatment and rehabilitation. The defendant appears to have benefitted from counseling and psychiatric treatment during his period of federal supervision, and the government would support including the continuation of treatment as a term of any period of supervised release.

IV.   **Conclusion**

For the reasons discussed in this memorandum, the government respectfully recommends that this Court sentence the defendant to a period of 33 months of imprisonment.

Date: September 4, 2024                          Respectfully Submitted:

                                                DARCIE N. MCELWEE
                                                United States Attorney


                                                */s/ Sheila W. Sawyer*
                                                SHEILA W. SAWYER
                                                Assistant United States Attorney
                                                U.S. Attorney's Office
                                                100 Middle Street
                                                Portland, Maine 04101
                                                (207) 780-3257
                                                Sheila.Sawyer@usdoj.gov

                                                and

                                                KRISTEN CLARKE
                                                Assistant Attorney General
                                                Civil Rights Division


                                                */s/Alec C. Ward*
                                                Alec C. Ward, Trial Attorney
                                                Civil Rights Division, Criminal Section
                                                U.S. Department of Justice
                                                150 M St., NE
                                                Washington, DC 20002
                                                (202) 532-3991
                                                Alec.Ward@usdoj.gov

14

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2024, I caused the foregoing Government's Sentencing Memo with the Clerk of Court using the CM/ECF system which will send notifications of such filing(s) to all counsel of record.

DARCIE N. MCELWEE
United States Attorney

*/s/Grace Herrick*
Grace Herrick
Paralegal Specialist

On behalf of:  SHEILA W. SAWYER
Assistant United States Attorney
U.S. Attorney's Office
100 Middle Street
Portland, Maine 04101
(207) 780-3257
Sheila.Sawyer@usdoj.gov