## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **DOCKET NO. 2:23-CR-00097-JAW** |
| | ) | |
| **CHARLES BARNES** | ) | |

### DEFENDANT'S SENTENCING MEMORANDUM

Charles Barnes respectfully submits this memorandum in support of his request that this court sentence him to probation to allow him to continue the ongoing counseling and medical treatment that is working. A fully probated sentence takes into consideration both the seriousness of this offense and Charles's acceptance of responsibility and efforts toward rehabilitation. A fully probated sentence is "sufficient, but not greater than necessary" based on the sentencing factors set out in 18 U.S.C. § 3553(a).

### I.      BACKGROUND

   **a.  Charles has a documented mental health history and has been diagnosed with PTSD related to a traumatic event involving S.G.B.**

Charles has a documented mental health history. See PSR ¶¶57-65. As noted in the PSR, in 2017 Charles discovered his significant other holding their child S.G.B. inside their burning home. PSR ¶52. Suffering from a mental health issue, she was purposefully not evacuating, restraining S.G.B., and singing Amazing Grace. *Id.* In addition to suffering from PTSD as a result of this incident, Charles is also very protective of S.G.B. See PSR ¶59.

More than a year before the present offense occurred, Charles reported to his primary care provider that he was having nightmares related to S.G.B. and the fire. PSR ⁋58. Charles also identified his anger as an issue and discussed wanting to redirect his rage. *Id.* Charles was prescribed medication to treat his anxiety. *Id.* He was diagnosed with depression and anxiety with panic attacks. *Id.* He was prescribed medications and referred to counseling for depression and panic attacks; however, he stopped attending counseling before June 2022. PSR ⁋⁋57,59.

### b. The present offense was triggered by an incident involving S.G.B.

K.T. and her child J.M. lived in the same housing development as Charles and S.G.B. J.M. is three years older than S.G.B. On August 29, 2022, they were playing in the same area of the apartment complex. An altercation occurred between them. Charles understood that during the altercation J.M. punched S.G.B.[1] Charles and K.T. discussed the incident but were not able to resolve the issue. Charles called the Lewiston Police Department to investigate, but he was unable to provide the last name of J.M., K.T.'s name, or their address.

This incident blew up in Charles's mind. That night, Charles had a very vivid nightmare in which he was unable to help S.G.B. who was in trouble.[2] Still suffering from the stress of S.G.B.'s assault and just waking from a nightmare, Charles reached out to a

---

[1] J.M. did not admit to punching S.G.B. but did admit to pushing S.G.B. See PSR ⁋12 J.M. admits that he pinned S.G.B. against a wall but did not strike him.

[2] Prior to this incident, Charles discussed with his provider having traumatic dreams regarding S.G.B. PSR ⁋58. On August 30, 2022, immediately upon confrontation by the officers, he told them he woke up from a nightmare. He confided in his doctor on September 19, 2022, that he had had a nightmare prior to this incident. PSR ⁋59.

mutual friend, D.F. When listening to the voice note as a whole, it is clear that Charles is still upset about and referencing the bullying of S.G.B. He was upset because of the incident involving his child.

### c. Charles is engaged in meaningful rehabilitative efforts.

With the help of medication and counseling, Charles recognizes that he responded inappropriately and illegally. This incident occurred on August 30, 2022. Charles returned to his treatment provider on September 15th and September 19th. PSR ❡59. He recounted the incident to his provider and asked for more medication and treatment. *Id.* A referral was made for him to go to Tri-County. Unfortunately, the waitlist at Tri-County was extremely long. The referral was received by Tri-County on September 26, 2022, and his psychiatric evaluation did not occur until November 15, 2023.

Because he was unable to self-pay for counseling, Charles was struggling to obtain the appropriate and necessary therapeutic treatment. With the help of United States Probation, he was connected with his counselor, John Carrol, at ESM. Probation essentially subsidizes Charles's treatment. Charles's treatment with Mr. Carrol began on or about October 19, 2023. Participating in treatment with Mr. Carrol has helped Charles recognize and address his own ignorance. He also focuses on managing his anger and developing coping skills to help with his anxiety. PSR ❡61. He consistently attends his scheduled appointments. He engages well and demonstrates good progress towards his goals. The presentence report includes an excerpt from a letter written by Mr. Carrol wherein he gives an example of how Charles has used tools learned in therapy to respond more appropriately to external threats to the safety of his children. Charles's mother who has been unequivocal

in her condemnation of Charles's conduct has recognized a positive change in Charles since he has been with his current counselor. PSR ₽65.

Mr. Carrol recommended Charles participate in a sleep study. That occurred on May 6, 2024. Based on the findings from the sleep study, Charles was diagnosed with REM sleep behavior disorder. This is a condition in which a person acts out their dream. It can involve sudden movements and outbursts of talking or yelling. Charles continues to attend counseling with Mr. Carrol and is participating in continued treatment based on the results of the sleep study.

## II.   OBJECTIONS TO THE PRESENTENCE REPORT AND GUIDELINE CALCULATION

There are three primary objections to the presentence report. First, the Government asserts that an enhancement under §3A1.1(a) is appropriate. Second, Charles objects to the six level enhancement under §2A6.1(b)(1) and further contends that if the six level enhancement does not apply, Charles is eligible for a four level reduction under§2A6.1(b)(6). Finally, Charles objects to the inclusion of the Computer Monitoring Special Condition of Supervision.

### a. Charles did not select the victim because of her race; therefore, an enhancement under §3A1.1(a) is not appropriate.

The burden is on the government to prove the applicability of this enhancement beyond a reasonable doubt. U.S.S.G. §3A1.1. This enhancement focuses on a defendant's motive and requires that the court find beyond a reasonable doubt that the defendant "intentionally selected any victim … **because of** the actual or perceived race, color,

4

religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person."

The motivation behind the threat was parental protective instinct, not race. There is ample evidence in the PSR to indicate Charles directed his threats at K.T. (through D.F.) **because of** the altercation between their children and **not because of** her race. In order for the enhancement in §3A1.1(a) to apply, Charles must have **intentionally chosen to threaten K.T. because of her race**. He simply did not do that. He sent the threatening message to D.F. about K.T. because he believed her child put hands on his child.

     **b. Charles objects to the six-level enhancement as there is no evidence he intended to carry out the threat.**

       *i. The Government Cannot Meet the Burden of Proof.*

"The burden of establishing the applicability of an enhancement is generally on the government." *United States v. Gordon,* 852 F.3d 126, 131 (1st Cir. 2017). "The government must prove the enhancement[]. . . by a preponderance of the evidence." *United States v. Bischoff*, 58 F. 4th 18, 23 (1st Cir. 2023); *citing United States v. Ilarraza*, 963 F.3d 1, 7-8 (1st Cir. 2020). The six-level enhancement requires the government to establish by a preponderance of the evidence that Charles engaged in exogenous conduct evidencing an intent to carry out the threat.

       *ii. The Government is Required to Prove that Charles Engaged in Conduct in Addition to the Threat Itself, that Evidences an Intent to Carry Out the Threat.*

When interpreting a sentencing guideline, we look first at the plain language of the guideline and, unless the Sentencing Commission has clearly indicated an intention to give

a certain term a special or guideline-specific meaning, we use the ordinary meaning for common words. *See U.S. v. Thompson*, 32 F.3d 1, 5 (1st Cir. 1994); *U.S. v. Brewster,* 1 F.3d 51, 54 (1st Cir. 1993). The enhancement requires "**conduct** evidencing an intent to carry out such threats" (emphasis added). §2A6.1(b)(1). The content of the threat itself does not amount to conduct evidencing an intent to carry out the threat. Action taken toward carrying out the threat does. Added details in the threat is not conduct, nor does it show greater intent. Conduct means "action" or "behavior" as illustrated by the conduct in the cases below.

> *U.S. v. Jimenez-Otero*, 898 F.2d 813 (1st Cir. 1990) (upholding trial court's determination that brandishing a weapon while making a threat, satisfies the conduct evidencing an intent enhancement in §2A6.1(b)(1).)

> *U.S. v. Dixon*, 449 F.3d 194 (1st Cir. 2006) (The threatening letters were smeared with defendant's blood and feces, the letters expressed his desire to infect the addressees stating "My Aids infected body fluid. Enjoy." The defendant was HIV-positive, was diagnosed with hepatitis, and one letter contained a white powder apparently simulating anthrax. Although there was no evidence to suggest that it was possible to contract HIV through the blood on the letters, the smearing of the bodily fluid coupled with his admission to investigators that he wanted to kill the victim was sufficient to support a finding that he possessed the requisite subjective intent to justify the enhancement.)

.

> *U.S. v. Sauerwein*, 5 F.3d 275 (7th Cir. 1993) (defendant identified the specific type of gun he would use to carry out his threat, contacted people in an effort to locate such guns, formulated a specific plan to get money to pay for the guns and recruited people to assist him in his plan to overthrow the federal government, evidencing intent to carry out threats on president's life; therefore, the six level enhancement was warranted.)

> *U.S. v. Berndt*, 127 F.3d 251 (2d Cir. 1997) (defendant's travel from Germany to the victim's home, having no permission to enter her property and lurking in her backyard at midnight constituted conduct evidencing intent to carry out the threat.)

*U.S. v. Hill*, 943 F.2d 873 (8th Cir. 1991) (intent to carry out threats to kidnap the victim evidenced by returning to town where she lived and attempting to hide out until school let out supported the inclusion of a six-point enhancement.)

*U.S. v. Hines*, 26 F.3d 1469 (9th Cir. 1994) (prior purchase of gun and unsuccessful trip to Washington for purpose of killing the president evidenced intent to carry out threat to kill the president and supported the six-point enhancement.)

*U.S. v. Goynes*, 175 F.3d 350 (5th Cir. 1999) (Although threats in letters defendant sent to an individual were extremely violent and one letter was signed in blood, these acts were merely threats and, absent some overt act, were **not conduct** sufficiently evidencing an intent to carry out threat to support six-level sentencing enhancement. U.S.S.G. § 2A6.1(b)(1) (emphasis added).)

The First Circuit has not decided the issue of whether §2A6.1(b)(1) requires exogenous, or additional conduct. *Dixon* recognized the circuit split over whether the "conduct" referred to in §2A6.1(b)(1) must be in addition to the threats ("exogenous") or may be contained solely within the threats. *Dixon*, 449 F.3d 194, 203 n3. But, finding clear additional conduct in *Dixon* (smearing the letters with his blood and his subsequent admission to the investigators that he wanted to kill one of the victims), the Circuit left the issue unresolved. *Id.*

The majority of circuit courts require that a defendant engage in some form of overt act before sustaining a §2A6.1(b)(1) enhancement. See *U.S. v. Goynes*, 175 F.3d 350, 353-355, note 2 (5th Cir. 1999) (the circuit split, and a collection of cases and examples are outlined). *Goynes* held that the 7th Circuit's position that "threats are enough to support a §2A6.1(b)(1) enhancement [contradicts] the plain language of the Guideline. Section 2A6.1(b)(1) authorizes an enhancement where the offense involves conduct evidencing an intent to carry out the threats. Therefore, this Circuit adopts the majority view requiring some form of overt act to sustain a § 2A6.1(b)(1) enhancement." *Id.* at 355. The reasoning

in *Goynes,* and in the majority of the Circuits having addressed the issue, is consistent with the "plain reading" guideline analysis taken by the First Circuit in *Dixon,* 449 F.3d at 203.[3]

While the First Circuit has not addressed this issue, Honorable D. Brock Hornby followed the majority of the circuits in not applying the 6-point increase for lack of exogenous conduct in *U.S. v. Baez,* 2:11-cr-00128-DBH, ECF #38 P57-58.

### iii.   *There is No Evidence Charles was Outside the Victim's Apartment on the Morning After the Threat was Made.*

A review of the body worn camera of Officer Pearce shows that at the time police arrived, although Charles was outside, he was unable to see K.T.'s apartment from where he was sitting. The apartment that was closest to where Charles was sitting was his own. There was an entire building between Charles's location and K.T.'s apartment building.

Similarly, the police report of Officer Robert Pierce is clear that on August 29, 2022, the day S.G.B. was assaulted, Charles was unable to provide J.M.'s last name, J.M.'s mother's name, or where they lived. This was still true on the morning of Charles's arrest when he, again, told officers he had not found out where J.M. lived. *Id.* He told Officer Pierce he had been home all morning and did not wait for K.T. anywhere. *See* PSR ¶8. Although Charles said in the voice message that he was parked outside of K.T.'s apartment since early that morning, there is no indication that he actually was outside of K.T.'s apartment.

---

[3] See also *U.S. v. Newell*, 309 F.3d 396, 403-404 and note 7 (6th Cir. 2002) also adopting the majority view and collecting cases (The district court, however, may not rely on the threats alone to apply a § 2A6.1(b)(1) six-level enhancement).

### iv. The Interaction Between Charles and the Victim on the Day Before the Threat was Made is Not Evidence That He Intended to Carry Out the Threat.

The initial discussion between Charles and K.T. on August 29, 2022, was not a substantial step, it was part of the triggering event. There are multiple conflicting reports about what occurred during that conversation. Regardless of which version of events is an accurate representation of what occurred, there was an intervening event. Charles called police for help. This act of involving law enforcement is the opposite of evidence of intent to carry out a threat. Given the multiple accounts of what occurred on August 29, 2022, the government cannot prove based on a preponderance of the evidence that this interaction rises to the level of conduct evidencing an intent to carry out a threat made in the future.

In this case, Charles admits to having sent the message to a third party, and he admits that the content of the message was threatening, terrible, and wrong. However, there is not any conduct, behavior, or action by Charles toward carrying out the threat.  Charles is the one that initially called police to investigation the incident between the children. Both before and after the threat was made, he told officers that he did not know where the victim lived. There is no security footage or witnesses who saw Charles lurking on the victim's property or peering through her windows. This is a case of one indirect vulgar threat, which constitutes the crime, but there is no additional conduct that invokes the enhancement of § 2A6.1(b)(1).

**c. If the Court does not impose the enhancement under §2A6.1(b)(1), the Court should find that this offense involved a single instance evidencing little or no deliberation.**

If the court finds "the offense involved a single instance evidencing little or no deliberation," then it should decrease the offense level by four. U.S.S.G. §2A6.1(b)(6).  In *United States v. Russell*, the defendant called 911 and said he was on his way to kill the president and that he had walked from Alabama to Georgia to do so. 322 Fed. Appx, 920, 924 (11th Cir. 2009). The 11th Circuit found that the fact that the defendant had, in fact, walked from Alabama to Georgia, coupled with his detailed explanation of his motives underlying the threat evidenced a finding of deliberation. *Id*. at 925. The Eighth Circuit denied the reduction for a defendant who made the same threat multiple times to multiple people because it was not the product of a "single impulse." *United States v. Humphrey*, 352 F.3d 1175, 1177 (8th Cir. 2003). In doing so, the court observed that the reduction offered by §2A6.1(b)(6) should be available to a defendant whose threat is the product of "a single impulse, or [is] a single thoughtless response to a particular event." *Id.*

It is clear from the record that the threat in this case was made to a third party. After leaving that voice message, Charles never repeated it. It was not a threat made with deliberation. This was a spontaneous outburst triggered by a nightmare. He did not take the time to look for the contact information of someone he did not know. He grabbed his phone and impulsively left a voice message. Therefore, Charles asks this court to apply a four-level reduction under §2A6.1(b)(6).

### d. The computer monitoring special condition of supervision is not reasonably based on the circumstances of the offense or Mr. Barnes's history.

The purposes of supervised release are the same as the purposes of sentencing generally: to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, to provide the defendant with needed educational or vocational training, medical care or other correctional treatment. 18 U.S.C. §3553(a)(2). The court, in determining the conditions of supervised release, "shall consider the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)." 18 U.S.C. § 3583(c)." The court may order, as a further condition of supervised release, to the extent that such condition is reasonably related to the factors set forth in section 3553(a) (1), (a)(2)(B), (a)(2)(C), and (a)(2)(D); involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a) and 18 U.S.C. § 3583(d).

All special conditions of release must be "based on the circumstances of the offense and the defendant's history" and "involve[] no greater deprivation of liberty than is reasonably necessary to achieve the goals of sentencing, such as 'protection of the public, deterrence, and rehabilitation.'" *United States v. Reardon*, 1.2 F.4th 558, 563 (1st Cir. 2024) quoting *United States v. Benoit*, 957 F.3d 20, 26 (1st Cir. 2020). "The critical test is whether

the challenged condition is sufficiently related to *one or more* of the permissible goals of

supervised release, and the fact that a condition of supervised release is not directly related

to the crime of conviction does not render that condition per se invalid." *United States v.*

*Sebastian,* 612 F.3d 47, 50 (1st Cir. 2010). Any condition imposed by this court must have

"adequate evidentiary support in the record." *United States v. York,* 357 F.3d 14, 20 (1ˢᵗ Cir.

2004).

> The CIMP Condition is a bundle of intrusive requirements, including that
> [the defendant] (i) identify various internet-capable devices and/or
> electronic systems and media to which he has access; (ii) allow
> examination of those devices and installation of monitoring software on
> them; (iii) allow geolocation of each device; (iv) provide Probation
> advance notification of "planned use" or purchase of any devices; (v)
> allow Probation access to any devices or captured data with or without
> suspicion that [the defendant] violated his conditions of supervision; (vi)
> be subject to Probation's power to limit him to "only one personal
> Internet-capable device, to facilitate [Probation's] ability to effectively
> manage and monitor the device"; and (vii) permit seizure and removal of
> his devices and electronic media for analysis by law enforcement or
> Probation based upon reasonable suspicion that a violation of a condition
> of supervision or unlawful conduct occurred or was about to occur.
> *United States v. Smith*, No. 19-CR-00421 (NCM), 2024 WL 1973362, at
> *2 (E.D.N.Y. May 3, 2024)

In *Smith*, the defendant pled guilty in State court to assault. No. 19-CR-00421 (NCM),

2024 WL 1973362, at *2 (E.D.N.Y. May 3, 2024). He subsequently made threats against

the prosecutor of that case. *Id.* He made multiple threats against the prosecutor. *Id.* He made

the threats to her directly. *Id.* They were graphic in nature saying, "I just want to tell you,

you are about to die…that little girl in the background is about to die." *Id.* The threats were

transmitted over telephone, voicemail, and text message. After imposition of the sentence,

probation asked the defendant to consent to participate in the computer and internet

monitoring program (CIMP). *Id*. Although he agreed initially, he subsequently rescinded his consent, and the probation department sought to formally add a condition that the defendant enroll in CIMP. *Id.*

The District Court opined on the intrusiveness of the condition as well as its sweeping nature. *Id*. at *2-3 *supra*. The court found the condition permitting search of the defendant's property upon reasonable suspicion satisfied the factors referenced in §3583(e)(2). *Id.* at *3. The Court was also persuaded that the current conditions satisfied the purposes outlined in §3553(a) without imposing greater restraint on the defendant's liberty than necessary. *Id.* at *4. Even though the defendant exercised poor judgement by contacting the assault victim at a time where there was no legal obligation to avoid contacting her, the court noted that the defendant had not actually violated any terms of his supervision. *Id.* The court considered the defendant's criminal history but found that his prior crimes against the prosecutor and the assault victim, on their own, had warranted imposition of such a broad program. *Id.*

The manner in which the threat was communicated in this case is very similar to leaving a message or voicemail. Like the defendant in *Smith*, Charles will already be subject to searches of his person, property, house, residence, vehicle, or "anything [he] owns, uses or possesses" upon reasonable suspicion he has violated any condition or upon reasonable suspicion that evidence of a violation with be found there. Although Charles exhibited poor judgement in his use of social media, he did so at a time when he had no legal obligation to avoid doing so. This is like the defendant in *Smith* who contacted a prior victim, exercising extremely poor judgement but not a violation. Similarly, Charles has a

track record of not violating any conditions of release. In the two years since he was first placed on bail conditions, Charles has had zero violations. Unlike the defendant in *Smith*, Charles's criminal history is remote, and the threat Charles made was communicated to a third party and not repeated multiple times through calls, voicemail, or text. It was not a pattern of behavior.

Even without the CIMP condition, Charles will be subject to more than 20 conditions of release. Since the moment he was approached by Officer Pearce on August 30, 2022, Charles has not had contact with the victims. Although he, at times evidenced poor judgement, that is not a sufficient basis to impose such an onerous condition. Probation will have the ability to search Charles's electronics if there is a reasonable suspicion that he is violating a condition. That is sufficient protection but not more restrictive than necessary.

### III.   GROUNDS FOR A BELOW GUIDELINE SENTENCE OF PROBATION.

#### a. Charles demonstrated extraordinary acceptance of responsibility that merits a downward variance.

##### i. *Charles Immediately Sought Treatment.*

Charles has gone above and beyond in his acceptance of responsibility. As described above, Charles returned to his treatment provider two weeks after the incident. Charles's bail conditions did not require him to attend treatment. He was not required by court order to return to treatment, his initial appearance was not until October 12, 2022. Similarly, he was not assigned an attorney until October 12, 2022. *Id.* Charles went back to his treatment provider on his own.

### ii. *Charles Admitted Fault in Multiple Venues.*

On May 22, 2023, Charles pled guilty in State Court as charged to Terrorizing, a Class D misdemeanor. He was placed on a twelve-month deferred disposition. During the year, Charles was required to pay $300, undergo a mental health evaluation and complete any counseling recommended. He was to have no contact with K.T. or J.M. This had an effect similar to an unsupervised probation for one year. If he successfully completed the requirements, the conviction would have remained on his record. If he was unsuccessful, in addition to the conviction on his record, he would have had to go to jail for 7 days. This was Charles's first criminal conviction in more than a decade. It imposed a monetary penalty. It required rehabilitative treatment. Perhaps most importantly, it offered the victims both acknowledgement of his bad actions and protection for at least one year.

Shortly after he pled guilty in criminal court, Charles agreed to a consent order in a civil action brought by the Maine Attorney General's Office. In this lawsuit, the Maine Attorney General's officed asked for injunctive relief pursuant to the Maine Civil Rights Act. The Complaint was dated April 3, 2023. Just two months later, on June 9, 2023, Charles signed a Consent Order. The Consent Order gave sweeping protection. It not only protected the victims, but it also protected the witnesses and their entire families. This is a *lifetime* protection order.

 After accepting responsibility in State Court and in Civil Court, three months later, the United States Government obtained an Indictment against Charles, and an Arrest Warrant was issued. Charles was arrested federally on September 12, 2023. Charles was granted pretrial release and ordered to participate in any psychiatric treatment required by

pretrial services. On March 18, 2024, Charles appeared before this Court and accepted

responsibility by pleading guilty to Interstate Communication of a Threat to Injure. This

was Charles's first felony conviction. He paid his felony assessment on that same date.

### iii.   *Charles's Commitment to Therapy is Working.*

Charles has described this part of the process as a blessing in disguise. As described

above, it was with the help of the Probation Office that Charles was connected with his

counselor. As his counselor has described, Charles has demonstrated an ability to use the

coping mechanisms he is learning in therapy.

> "…Barnes had learned and practiced coping skills to manage anxiety.
> Mr. Barnes has openly described a history of explosive anger with periods of
> amnesia. He acknowledged his fear of experiencing anger and subsequently
> losing control of his behavior. He has learned several strategies to manage
> this history including self-soothing exercises, removing himself from the
> trigger, and verbally expressing his anger with a supportive person. Mr.
> Barnes has used cognitive restructuring exercises to overcome his sense of
> hopelessness and to secure part-time employment. During this period of
> treatment, Mr. Barnes experienced two different significant challenges:
> external threats to the safety of two of his children: threats to which any
> reasonable parent would react with intense outrage, and in Mr. Barnes' case,
> with explosive anger. Mr. Barnes used his learned skills and new supports to
> process his rage and hate without acting out. He applied his therapeutic gains
> to demonstrate substantial growth in this area." PSR ¶61.

Charles has put into practice as much of an effort as the system could hope for. Not

only is he addressing his mental health and anger in therapy, but he is also addressing his

ignorance. Especially since beginning counseling with Mr. Carrol, he has outwardly

exhibited his acceptance of responsibility. In describing his actions to the PSR writer

Charles said "I scared her so bad; I know I did. The things I said were so bad." PSR ¶18.

He reiterated by acknowledging that "what I said was wrong on every level." PSR ¶19.

Even in the medical context when he was seeking treatment, Charles acknowledged that his actions "horrified him." PSR ¶60.

### iv.  *Charles's Acceptance of Responsibility is Exceptional.*

Charles has accepted responsibility in every way that has been asked of him. He unilaterally sought medical treatment. He pled guilty in State Court. He agreed to a Consent Order in Civil Court. He pled guilty in Federal Court. He is receiving medical and mental health treatment. He continues to meaningfully participate in therapy. He has been working with his providers to adjust his medications and dosages for maximum effectiveness.

In the two years since this offense occurred, not once has there been an issue with Charles's release. After the date of the incident, Charles – as he should - took great care to avoid the victim and her family. Charles has, at all times, remained compliant with his State bail conditions, the terms of his State deferred disposition, the terms of the Civil Consent Order and the rules of his Federal Pretrial release.

Charles now has his first and only felony conviction. There have been multiple news articles about his conduct that included his photograph. He was evicted from the apartment complex where the incident occurred. Charles initially lost his job but was able to get rehired at the redemption center. He will be supervised for the next three years. Even when that supervision concludes, the victim will continue to be protected under the lifetime order of protection. All of this taken together demonstrates Charles's exceptional acceptance of responsibility meriting a downward variance.

**b. Charles's family responsibilities are grounds for a downward variance.**

Charles is the biological father to five children and the stepfather to one. Four of these children reside with Charles and his wife. Two of them have learning disabilities that require IEPs. Letter from Adrienne Barnes. One of the two is disabled. PSR ⁋ 69. A third child was recently referred for an IEP. Charles, his wife, and children live in poverty. Until recently, they were living in a camper that Charles, himself, was attempting to convert into a "tiny home." PSR ⁋55. At times, the only power to the camper was via an extension cord. *Id.* Charles was the only individual in the home who is physically able to empty the septic waste. Letter from Adrienne Barnes. There was no on-site laundry. *Id.* Despite these issues, it was suitable for living. PSR ⁋55. Recently, code enforcement for the town required Charles and his family to move from the property to a trailer in a new town.

Charles is a committed and involved parent who does his utmost to provide for his family. Because his wife does not drive, Charles is responsible for all transportation. Letter from Adrienne Barnes. He transports the children to and from doctor appointments. *Id.* He is actively involved in their education. *Id.* He gets the children ready for school in the morning and transports them to school when necessary. *Id.* He helps them with their homework. *Id.* He cooks dinner. *Id.* Because his wife is unable to do heavy lifting, many of the household chores also fall to Charles. *Id.* For example, taking out the trash, carrying the groceries, and shoveling the snow. *Id.* On top of all these duties, Charles was able to get a job to help support his family. Letter from Jesse St. Laurant. He counts bottles as they are returned to the redemption center. He sorts the bottles. He loads the finished bags on to the trucks. He takes out trash and mops the floors.

The commentary to 5H1.6 provides a framework for a guideline departure when a defendant holds a major caretaker function. These same factors can be considered by the court for the purposes of a variance.

1. An incarcerative sentence will cause a substantial, direct, and specific loss of essential caretaking to the defendant's family.

2. The loss of caretaking substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.

3. The loss of caretaking is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking support irreplaceable to the defendant's family.

4. The departure effectively will address the loss of caretaking.

Each of the commentary criteria are met in this case. Charles has four minor children living with him. Three of the children require an IEP for their disabilities. One of the children receives disability benefits. Charles is the only adult in the home who can drive the children to and from their medical and mental health appointments. His wife is unable to work outside of the home. If Charles is unavailable due to incarceration, the family will lose the ability to transport the children to their appointments in addition to his income. For a family already living in poverty, Charles's incarceration would be devastating.

## IV.    CONCLUSION

Punishment is surely warranted for Charles's behavior, but at this point a term of imprisonment is not necessary to reflect the seriousness of Charles's offense, promote respect for the law, or achieve just punishment. He has admitted guilt in State court and in

Federal Court. He now has his first felony conviction. He has agreed to a civil order giving lifetime protection to the victim and witnesses. He is employed. Thanks to pretrial services and the probation office, Charles is in counseling that is working. He has four minor children who are dependent upon him, three with disabilities. He is the only caregiver able to get them to and from their necessary appointments. He has been on some form of bail or supervision for two years with no issue. Under the unique facts and circumstances of this case, a sentence of probation is appropriate.

DATED: September 4, 2024                    */s/ Caleigh S. Milton*_____
                                           Caleigh S. Milton
                                           Attorney for Defendant
                                           Assistant Federal Defender
                                           P.O. Box 595
                                           Portland, Me 04112-0595
                                           207-553-7070
                                           FAX: 553-7017
                                           caleigh_milton@fd.org

### CERTIFICATE OF SERVICE

I, Caleigh S. Milton, attorney for Charles Barnes, hereby certify that I have served electronically, a copy of the within **DEFENDANT'S SENTENCING MEMORANDUM** upon Assistant United States Attorney Sheila Sawyer and Alec Ward via the ECF system.

DATE:          September 4, 2024          */s/ Caleigh S. Milton*
                                          Caleigh S. Milton